# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY L. PACKHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10 C 2855 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | Magistrate Judge Morton Denlow |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Claimant Jeffrey L. Packham ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB"). Claimant raises the following issues in his motion: (1) whether the ALJ properly considered the evidence in determining Claimant's residual functional capacity; (2) whether the ALJ made a valid credibility finding regarding Claimant's testimony and other lay witness statements; and (3) whether the ALJ properly considered the evidence in finding that Claimant could perform his past relevant work as a janitor. For the following reasons, the Court denies Claimant's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

# I.  BACKGROUND FACTS

## A.    Procedural History

Claimant initially filed for DIB on November 14, 2006, alleging a disability onset date of November 1, 2005.  R. 153.  The Social Security Administration ("SSA") denied his application on March 29, 2007.  R. 107.  Claimant then filed a request for reconsideration, which the SSA denied on August 10, 2007.  R. 115.  Shortly thereafter, Claimant requested a hearing before an administrative law judge.  R. 119.

On September 17, 2009, Administrate Law Judge Helen Cropper (the "ALJ") presided over a hearing at which Claimant appeared with his attorney, Andrew Barone.  R. 30–104.  Claimant and Michelle Peters, a vocational expert, testified at the hearing.  No medical expert testified.  On November 19, 2009, the ALJ rendered a decision finding Claimant was not disabled under the Social Security Act.  R. 7–23.  Specifically, the ALJ found that Claimant had "the physical [residual functional capacity] to perform a full range of work at all exertional levels" and that he had "the mental [residual functional capacity] to perform and sustain simple, repetitive unskilled work of the type he performed during 2007 and continuing to the present."  R. 15.

Claimant then filed for a review of the ALJ's decision to the Appeals Council.  R. 4.  On March 4, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  R. 1–3.  Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

## B.    Hearing Testimony—September 17, 2009

### 1. Jeffrey Packham—Claimant

At the time of the hearing, Claimant was 57 years old, single, and living with his mother. R. 43. Claimant is a high school graduate and has past relevant work experience as a janitor and maintenance worker. R. 36–37, 213. Claimant has experience performing janitorial work going back to about 1979. R. 52–57. Claimant also has a history of alcoholism. Claimant has once been fired from a full-time position for drinking on the job, R. 53–55, and he has quit at least one other position because of his drinking problem, R. 47–48. On November 19, 2005, Claimant suffered a serious fall as the result of a two-day drinking binge. R. 46, 326–27. He asserts that he stopped drinking after the accident. R. 75.

Since his fall, Claimant has worked only sporadically, performing cleaning or yard-keeping duties at various apartment and condo buildings and earning about $400 per month. R. 48–50, 63. That said, Claimant did work full-time cleaning an apartment building for a six-week stretch in 2007, as a replacement for an injured worker. R. 50. When asked whether he had trouble doing the work there, Claimant responded, "No. It was kind of stressful though." R. 50. Since that time, Claimant has returned to the same full-time job for one- or two-week stretches about twice a year to fill in for workers on vacation. R. 51–52.

Claimant asserted that he could not handle full-time employment because he "can't remember how to put things back together." R. 65. Apparently, Claimant in the past performed more complex maintenance work, such as plumbing or HVAC work. R. 52.

Claimant also testified about the depression and anxiety that he alleges form the basis of his disability. He began seeing a psychiatrist and taking medication for his anxiety in

early 2005. He has taken Librium, Zoloft, doxepin, Sinequan, and Ambien. R. 66–70, 72. At the time of the hearing he was taking Cymbalta, Risperdal, and BuSpar. R. 69–70. Claimant testified that he feels depressed every day, as a result of which he lacks concentration and struggles to go to work or do work around the house. R. 73. He stated that when he feels depressed and has work to perform, he puts off the work for two to three days. R. 73–74. Nevertheless, Claimant also admitted that his medication makes his depression and anxiety "better" and allows him to function outside his home. R. 72–73.

Upon examination by his attorney, Claimant also testified to feelings of paranoia. R. 81. When he sees people in public, he often feels that they are following him, and these feelings occasionally force him to stay at home or return home. R. 81. For instance, three months before the hearing, Claimant drove only part way to work and then turned back because he believed someone was following him. R. 81–82. He claims to suffer panic attacks lasting about half an hour about once a week. R. 75.

As for his physical abilities, Claimant stated that he can lift about 100 pounds and that he has not recently seen a doctor for physical problems. R. 78–79. He does laundry, house cleaning, grocery shopping, and most of the cooking for his mother. R. 77. He has a valid driver's license and drives most days, either to work or the grocery store. 44–45.

### 2.    Michelle Peters—Vocational Expert

The vocational expert ("VE"), Michelle Peters, classified Claimant's past relevant work as janitor and maintenance positions. R. 92–93. Pursuant to the Dictionary of Occupational Titles, janitor is a low semiskilled, medium physical demand level occupation.

R. 92–93.  Maintenance worker is a skilled, medium physical demand level occupation.
R. 93.

The ALJ then offered a hypothetical to the VE, posing a 57-year-old high school graduate with the past relevant work just described; a moderate limitation in ability to perform complex or detailed assembly talks or to remember assignments for extended periods; and an ability to respond appropriately to supervisors and coworkers.  R. 93.  The VE testified that this hypothetical person could not perform a maintenance worker position, but gave no categorical opinion as to whether the person could perform a janitorial position.  R. 94–96.  She further described a janitor's duties as "pretty repetitive," including tasks like sweeping, mopping, and vacuuming, with occasional more complex tasks such as replacing filters on furnaces or using a scrubbing machine.  R. 94.  To maintain full-time employment, such a worker must remain on-task through 82 percent of the day and may miss on average one and three-quarters days of work per month.  R. 96.  On examination by Claimant's counsel, the VE stated that Claimant's current job would not amount to competitive employment if it allows him to not show up for days on end without losing the position.  R. 97.

## C.    Lay Witnesses

### 1.    Function Reports by Harriet Packham—Claimant's Mother

Harriet Packham ("Ms. Packham") completed two functional reports about Claimant for the Illinois Bureau of Disability Determination Services, the first in December 2006 and the second in July 2007.  Both made similar statements.  She reported that Claimant performs

some household chores and repairs but needs encouragement to start and finish tasks. R. 222, 257. Ms. Packham also indicated that Claimant's impairments interfere with his ability to talk, understand, follow instructions, complete tasks, remember things, and concentrate. R. 224, 259. According to Ms. Packham, Claimant can only pay attention for about half an hour at a time. R. 224.

### 2. Lay Witness Statements—Jerry Packham and Jennylynde Packham

Claimant also submitted lay witness statements from his brother, Jerry Packham, and niece, Jennylynde Packham. Jerry Packham reported that he speaks with his brother by telephone every two to four weeks. R. 282. He states that Claimant has difficulty concentrating and has become withdrawn, irritable, and without friends or social support. R. 282. Jennylynde Packham reported that she has seen or spoken to Claimant frequently and that he has suffered "labile mood" and decreased cognition since his fall. R. 281.

**D.     Medical Evidence**

**1.     November 2008 Stay at Swedish Covenant Hospital**

As a result of his alcohol-induced slip and fall, Claimant went to Swedish Covenant Hospital on November 19, 2005.  R. 326–27.  The emergency room physician diagnosed Claimant with acute alcohol withdrawal, malnutrition, dehydration, and intercerebal hemorrhage.  R. 331.  CT and MRI scans revealed some bleeding and swelling in his brain.  R. 319–222.  On November 28, Claimant underwent a speech, language, and cognitive evaluation that revealed mild problems with auditory comprehension, pragmatic skills, and cognition.  R. 370.

**2.     Recovery in Harmony Nursing and Rehabilitation Center**

As Claimant's condition improved he was transferred to Harmony Nursing and Rehabilitation Center.  R. 331–32.  There, he underwent a social history assessment that found he had a depressed and anxious mood, but which also described him as friendly and cooperative.  R. 672–73.  The discharge note in Claimant's social progress notes opined that Claimant "doesn't appear able to work at this time due to restlessness, irritability, and impaired attention-span," but it is not clear who wrote that note or what treating relationship gave rise to the opinion.[1]  R. 671. At the same time, a nursing home activity assessment found Claimant alert and oriented, without attention span problems or problems following directions.  R. 682.  Claimant was discharged from Harmony Nursing on January 1, 2006 at

---

[1] The note appears to be signed by "A. Myers, OCP," but neither party provides any further explanation of the author's identity.

his own insistence.  R. 573, 671.

### 3.    Mental Health Assessment at Chicago Department of Public Health

In August 2006, Claimant visited the Chicago Department of Public Health, Division of Mental Health ("Department of Health"), seeking treatment for anxiety, depression, and obsessive-compulsive disorder ("OCD").  R. 833.  A comprehensive mental health assessment diagnosed Claimant with generalized anxiety disorder, depressive disorder, and a history of alcohol dependence.  R. 856.  The assessment also assigned Claimant a Global Assessment of Functioning ("GAF") score of 63.  R. 856.  The GAF is a scale of zero through 100 used by mental health professionals to rate the social, occupational, and psychological functioning of adults.  A score of 61–70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships."  *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 34 (4th ed. 2000).

### 4.    Ongoing Treatment and Counseling at the Department of Health

Dr. Jessie Mabaquiao, a Department of Health psychiatrist, treated Claimant from September 2006 through at least May 20, 2009, seeing Claimant every one to two months.  R. 795–800, 902–12, 1012–65.  Dr. Mabaquiao performed an initial psychiatric evaluation on September 7, 2006, in which he diagnosed Claimant with major depression, generalized anxiety, and a history of alcohol dependence.  R. 796.  He also assessed Claimant's GAF score as 65.  Dr. Mabaquiao prescribed Remeron and BuSpar.  R. 796.  On September 12,

Claimant returned and Dr. Mabaquiao prescribed Prosac. R. 910. Claimant returned for follow-up on October 5, reporting that he felt less depressed and was sleeping better. R. 909. Dr. Mabaquiao described Claimant's status as "improved." R. 909. In November and December follow-ups, Dr. Mabaquiao found Claimant's memory within normal limits and described Claimant's status since his last visits as "improved" and "stable," respectively.

Meanwhile, Claimant also sought counseling at the Department of Health, generally from Mr. Leon Leslie, who trained Claimant in various techniques to cope with his symptoms. R. 881–84. Mr. Leslie also helped Claimant fill out an application for disability benefits. R. 882–83.

### 5. Mental Health Assessments Relating to Claimant's Application with the Bureau of Disability Determination Services

After treating Claimant for about three months, Dr. Mabaquiao completed a psychiatric report on December 14, 2006 for the Illinois Bureau of Disability Determination Services, after Claimant applied for disability benefits. R. 803–806. After detailing Claimant's personal and medical history and describing numerous cognitive tests that he had given Claimant, Dr. Mabaquiao provided an assessment of Claimant's ability to work. Although Claimant had reported to the psychiatrist that his symptoms made working difficult, R. 803, Dr. Mabaquiao opined that "Claimant's ability to do work seems to be average." R. 806. He expanded, "[Claimant] could understand instructions. Possible memory impairments could hamper his ability to remember instructions. [Claimant] seems to be able to respond to supervision, get along with co-workers. [Claimant]'s ability under

pressure could be below average due to symptoms." R. 806.

In February 2007, a non-examining agency review, Tyrone Hollerauer, Psy.D., completed a psychiatric review technique form, based on Claimant's allegations as viewed against his medical history, including the form completed by Dr. Mabaquiao. Dr. Hollerauer concluded that Claimant's impairments were non-severe with only mild limitations. R. 807, 817. Another reviewing doctor affirmed this determination. R. 1009–11.

### 6.    Internal Medicine Examination—Dr. Alexander Panagos

Also in connection with the Bureau of Disability Determination Services, Dr. Alexander Panagos performed an internal medical examination lasting about thirty minutes on March 12, 2007. R. 821. After this exam, Dr. Panagos submitted a four-page report detailing his exam. R. 821–24. Among other things, Dr. Panagos noted that Claimant "appeared to be in no acute distress" and had a "[f]ull range of motion in all joints." R. 822–23. Dr. Panagos also evaluated claimant's mental status at the exam, noting among other things that Claimant's "recent and remote memory was intact" and that Claimant "was able to concentrate and maintain his attention span." R. 823. After receiving this report, a non-examining reviewer, Dr. Henry Bernet, completed a residual functional capacity ("RFC") assessment indicating that Claimant could perform medium level work, including occasionally lifting up to fifty pounds. R. 825–832. Another non-examining reviewing doctor affirmed this assessment. R. 1009–11.

### 7.    Treating Physician Dr. Mabaquiao 2007–2009

After 2006, Dr. Mabaquiao continued to treat Claimant in much the same manner

described above.  In January 2007, Claimant reported only mild depression and less anxiety.

R. 908.  Over the next six months, Claimant continued to report decreased symptoms, and

Dr. Mabaquiao continued to describe claimant's condition as stable or improved.  R. 904–08.

In August 2007, Claimant reported to Dr. Mabaquiao that he was feeling 50% less depressed

as compared to not taking medication; sleeping better (six hours per night); and experiencing

less anxiety and no panic attacks.  R. 902.

Although Claimant maintains that he continued regular treatment with Dr. Mabaquiao

in late 2007 and early 2008, the record lacks further treatment notes until April 2008.  In this

April visit, Claimant complained of feeling paranoid, although he also reported less anxiety

and no depression.  R. 1103.  Dr. Mabaquiao prescribed Risperdal for the paranoia and

assigned Claimant a GAF score of 65.  R. 1054–55.  At Claimant's next visit in May,

Claimant related feeling better but still complained of paranoia, admitting that he had not

taken the prescribed Risperdal.  R. 1049.  In July, Claimant returned, this time after taking

all of his assigned medication.  R. 1043.  Claimant reported feeling better but still paranoid,

with mild depression and mild panic attacks at times.  R. 1043.  Dr. Mabaquiao described

Claimant as "clinically better."  R. 1043.  In September 2008, Claimant told Dr. Mabaquiao

that he felt "much better," and Dr. Mabaquiao assigned a GAF score of 65.  R. 1039.

Claimant continued to see Dr. Mabaquiao through at least May of 2009, with no major

changes appearing in the progress notes and GAF scores of 63–65 assigned by Dr.

Mabaquiao.  R. 1024–26, 1033–35, 1062–64.

**E.      The ALJ's Decision—November 19, 2009**

On November 19, 2009, the ALJ issued her decision finding that Claimant had the residual functional capacity ("RFC")[2] to perform past relevant work and therefore denied his application for DIB.  R. 10–23.  The ALJ evaluated Claimant's application under the five-step sequential analysis required by 20 C.F.R. § 404.1520.  R. 12–23.  At step one, she found that Claimant performed disqualifying substantial gainful activity ("SGA") in 2007, because Claimant reported earning $12,500 that year, which exceeds the presumed SGA level for that year of $900 per month.  R. 12.  Nevertheless, Claimant's 2006 and 2008 earnings did not exceed the presumed SGA levels for those years.  R. 12.  At steps two and three, the ALJ found that Claimant had the severe impairments of depression and anxiety but that these impairments did not meet or equal one of the listed impairments in 20 C.F.R. § 404.1520(d).  R. 13–15.  The ALJ also concluded that the record does not support an OCD impairment.[3]  R. 13.

As for the residual functional capacity finding necessary before proceeding to step four, the ALJ determined that Claimant had "the physical RFC to perform a full range of work at all exertional levels" and "the mental RFC to perform and sustain simple, repetitive unskilled work" of the sort he performed during 2007 and through the decision date.  R. 15.  She elaborated that Claimant "can understand, remember and carry out simple, routine instructions, can respond appropriately to supervisors and coworkers, and can adapt to the

_____

[2] The RFC is the most that a claimant can do despite the effect of his impairments. 20 C.F.R. § 404.1545(a).

[3] Claimant does not contest this finding.

type of changes that would be expected in such a setting." R. 15. She also concluded that Claimant "would be distracted only rarely by symptoms to the extent that he was off task and not productive outside break time." R. 15. The ALJ found the lay witness statements and Claimant's testimony not credible to the extent they were inconsistent with this RFC determination. R. 22.

At step four, the ALJ concluded that Claimant could perform his past relevant work as a janitor, because it does not require work-related activities precluded by his RFC. R. 23. Because of this step-four finding, the ALJ had no need to make a step-five finding and therefore concluded that Claimant was not disabled from November 1, 2005 through the decision date. R. 23.

## II.  LEGAL STANDARDS

### A.  Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Under such circumstances, the district court has jurisdiction to review the ALJ's decision. *Id.* Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The ALJ need not address every piece of evidence or testimony presented, but rather must provide a "logical bridge" between the evidence and the ALJ's conclusions, so that a court can assess the agency findings and afford the claimant meaningful judicial review. *Jones v. Astrue*, --- F.3d ---, 2010 WL 4137570, at *4 (7th Cir. 2010). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.    Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739–40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

Social security regulations prescribe a five-step sequential analysis for evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i–v). Under this approach, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the burden shifts to the ALJ to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### III. DISCUSSION

Claimant raises the following issues in his motion: (1) whether the ALJ properly considered the evidence in determining Claimant's residual functional capacity; (2) whether the ALJ made a valid credibility finding regarding Claimant's testimony and other lay witness statements; and (3) whether the ALJ properly considered the evidence in finding that

Claimant could perform his past relevant work as a janitor.

## A. The ALJ Reasonably Relied on the Opinion of Claimant's Treating Physician in Making Her RFC Finding.

An ALJ makes a RFC determination by weighing all the relevant evidence of record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. In doing so, an ALJ must determine what weight to give the opinions of the claimant's treating physicians. 20 C.F.R. § 404.1527. A treating physician's opinion is entitled to controlling weight if it is supported by the medical findings and not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). An ALJ must offer good reasons before discounting a treating physician's opinion. *Campbell v. Astrue*, --- F.3d ---, 2010 WL 4923566, at *6 (7th Cir. 2010).

Here, the ALJ properly relied on Dr. Mabaquiao's opinion. Importantly, he served as a treating psychiatrist for several years, far longer than any other doctor treated Claimant during the relevant period. Moreover, Dr. Mabaquiao is the only treating doctor who completed an impairment or RFC evaluation. Dr. Mabaquiao's opinion regarding Claimant's ability to work occurred relatively early, but, as noted by the ALJ, Dr. Mabaquiao's subsequent progress notes reveal that Claimant's condition remained stable or even improved throughout the course of treatment. R. 20. Indeed, throughout the time he treated Claimant, Dr. Mabaquiao assigned GAF scores in the 60's, indicating only mild symptoms. Claimant rightly points out that remarks such as "stable" or "improved" in treatment notes do not necessarily mean that a person can work. *See Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir.

2008). But here, the ALJ relied on Dr. Mabaquiao's substantive opinion about Claimant's ability to work, merely using the later progress notes to show that Claimant's status remained stable after Dr. Mabaquiao rendered his opinion. The ALJ properly gave significant weight to Dr. Mabaquiao's opinions that Claimant had an "average" ability to work, but that Claimant's ability to work under pressure could be "below average." R. 20.

Claimant argues that the ALJ failed to account for several other pieces of evidence, but none of them merit remand. First, claimant raises the November 28, 2006 cognitive test at Swedish Covenant, but that test revealed only mild problems and does not on its face contradict Dr. Mabaquiao's opinion. Likewise, a social history assessment at Harmony Nursing recorded that Claimant was "slightly forgetful." R. 672.

A January 1, 2006 discharge note within the nursing home's "social progress notes" did state that Claimant appeared unable to work due to restlessness, irritability, and impaired attention-span. The ALJ, however, need not address every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports a disability finding. *Jones*, 2010 WL 4137570, at *4. One could hardly argue that this note constitutes a "line of evidence." It does not set forth what observations or tests, if any, formed a basis for the conclusion; does not appear to be written by a doctor; and does not reveal the treating relationship between Claimant and the author. R. 670–71. Although this opinion may have been necessary to address had it appeared in different context, for instance in an impairment report by a treating physician, the ALJ was not obligated to address a one-sentence aside buried in a nursing home's social progress notes. This isolated note occurred prior to Dr.

Mabaquiao's substantive opinion rendered on December 14, 2006.

Claimant also objects that the RFC determination does not conform with Dr. Mabaquiao's opinion. Specifically, Claimant complains that the ALJ failed to incorporate the possible memory and stress limitations noted by Dr. Mabaquiao. Dr. Mabaquiao opined that Claimant "could understand instructions" but that "[p]ossible memory impairments could hamper his ability to remember instructions" and that "[Claimant]'s ability under pressure could be below average due to symptoms." R. 806. Meanwhile, the ALJ found that Claimant could "understand, remember and carry out simple, routine instructions." R. 15.

First, one must note that Dr. Mabaquiao's opinion raised only potential limitations. Given this, the ALJ was justified in looking to Claimant's own employment history to determine Claimant's ability to remember instructions or perform under pressure. The ALJ did so and found that Claimant had the ability to perform only "simple, repetitive unskilled work of the type he performed during 2007 and continuing to the [hearing date]." R. 15. Nowhere in Claimant's testimony did he assert that a memory problem prevented him from performing the janitorial work he completed in 2007 through the hearing date. Nor did he allege that his jobs, including the stretches where he worked forty-hour weeks, resulted in debilitating pressure to perform. Indeed, as noted by the ALJ, Claimant continued to perform similar work for some of the same employers both before and after the alleged onset of his disability. R. 22. Ultimately, the ALJ's RFC finding fairly reflected Dr. Mabaquiao's opinion.

**B.     The ALJ's Credibility Finding Was Not "Patently Wrong."**

An ALJ's credibility determinations deserve special deference, because only the ALJ observes the claimant testify. *Jones*, 2010 WL 4137570, at *4. Rather than nitpicking for inconsistencies or contradictions, courts are to give a commonsense reading to an ALJ's opinion and to reverse credibility determinations "only if they are patently wrong." *Id.*

Claimant points to several sections of his testimony and lay witness statements that seem to conflict with the ALJ's findings. But applicants for disability benefits have an incentive to exaggerate their symptoms, and an ALJ may discount the applicant's testimony based on other evidence in the case. *Johnson v. Barnhardt*, 449 F.3d 804, 805 (7th Cir. 2006). The applicant's family likewise have an incentive to exaggerate, particularly where DIB would mean extra household income, as they would for Claimant's mother here.

The ALJ's credibility determination in this case was not patently wrong. For instance, Claimant maintains that he is only capable of working one or two days a week for about one hour at a time. But the ALJ found this testimony inconsistent with both Dr. Mabaquiao's opinion and treatment notes, which suggested an average ability to work, and Claimant's work history, which included working full-time for six consecutive weeks in 2007. R. 21–22. As the ALJ noted, Claimant stopped working full-time because the person Claimant had replaced returned to work, not because Claimant could not handle the job. R. 21.

The ALJ also remarked that Claimant actively assisted his elderly mother by performing routine chores around their shared house. R. 23. Claimant rightly notes that an ability to perform sporadic physical activity does not imply an ability to work eight hours a

day.  *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004).  But the ALJ did not rely solely on this evidence in making her RFC finding.  Rather, she relied primarily on Claimant's work history and Dr. Mabaquiao's opinion.  R. 22.

Finally, Claimant questions the ALJ's social functioning finding, highlighting Ms. Packham's assertions that Claimant was socially withdrawn.  Although the ALJ did not specifically address Ms. Packham's assertions, she did note similar lay witness statements from Claimant's brother and niece.  R. 22.  The ALJ simply gave more credence to Dr. Mabaquiao's GAF scores in the 60's, R. 22, scores which signified "only mild symptoms" and "some meaningful relationships."  *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 34 (4th ed. 2000).  Accordingly, none of Claimant's arguments show that the ALJ's credibility determination was patently wrong.

## C. Substantial Evidence Supports the ALJ's Finding that Claimant Can Perform His Past Relevant Work as a Janitor.

Finally, Claimant argues that the ALJ made an erroneous step-four determination. Relying on the VE's testimony and the RFC finding, the ALJ concluded at step four that Claimant could perform his past relevant work as a janitor.  R. 23.  Claimant contends that this finding was invalid both because of problems with a hypothetical posed to the VE and because of supposed conflicts between the VE's testimony and the Dictionary of Occupational Titles.  Claimant also argues that the ALJ erred by relying relying on past work that occurred after the alleged disability onset date.

First, Claimant objects that the ALJ posed an improper hypothetical to the VE.  The

ALJ posited a 57-year-old male with no exertional limitation, "moderately limited in the ability to perform complex or detailed assembly tasks or to remember assignments for extended periods of time," and "[a]ble to respond appropriately to supervisors, coworkers." R. 93. Such a hypothetical ordinarily must include all limitations supported by medical evidence in the record. *O'Connor-Spinner v. Astrue*, --- F.3d ----, 2010 WL 4812819, at *3–5 (7th Cir. 2010) (reversing and remanding for ALJ's failure to fully incorporate RFC finding into a hypothetical). Here, Claimant does not contend that the ALJ unfairly characterized her RFC finding when stating the hypothetical. Rather, Claimant essentially rehashes his disagreement with the RFC finding itself. As with the RFC finding, Claimant protests that the hypothetical failed to account for Claimant's full extent of impairment; for instance, the hypothetical did not incorporate Claimant's allegations that he must put off his work for days at a time or that his paranoia hampers his interactions with other people. As explained above, however, the ALJ made a valid RFC finding based on the medical evidence and was not bound to fully credit Claimant's testimony. Given the RFC finding, the ALJ formulated a valid hypothetical.

Claimant also complains that an inconsistency exists between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). If a conflict exists between VE testimony and the DOT, the ALJ has an affirmative duty to "elicit a reasonable explanation for the conflict before relying on the [VE] evidence to support a determination or decision about whether the claimant is disabled." S.S.R. 00-4p; *see also Prochaska v. Barnahrt*, 454 F.3d 731, 735–36 (7th Cir. 2006). Claimant argues that such an inconsistency arose between the ALJ's finding

that the Claimant could perform unskilled work and the DOT's description of Claimant's past janitorial work as semi-skilled. But the DOT seems of questionable relevance here, because the ALJ found that Claimant could perform a particular past job, as opposed to an abstract job type. *See* S.S.R. 82-61 (recognizing distinct tests for ability to perform a particular past relevant job and ability to perform past work at it exists in the national economy). In any case, Claimant shows no inconsistency between the VE's testimony and the DOT. The VE correctly identified janitor as a low semi-skilled position and then proceeded to describe the specific duties assigned to that position by the DOT. R. 94–96. She described the duties as "pretty repetitive" and similar to unskilled cleaning positions, but with an occasional more complex task such as changing a furnace filter. R. 94–96. Any tension with the DOT arose only in the ALJ's decision, when the ALJ found Claimant limited to unskilled work but also capable of performing his past relevant work as a janitor. R. 15, 23. And the ALJ provided a reasonable explanation; in finding the Claimant able to perform his past relevant work as a janitor, she noted that Claimant had not described his job as requiring any complex tasks that he had difficulty performing. R. 23. Ultimately, given the VE's testimony and the ALJ's valid RFC determination, substantial evidence supported the ALJ's step-four finding.

Finally, Claimant's counsel asserted at oral argument that the ALJ erred by relying on past work that occurred after the alleged disability onset date, and asserted that an ALJ may only look to work performed before the alleged onset date when considering a claimant's past relevant work. In support of this proposition Claimant cites two Program Policy Statements, S.S.R.'s 82-61 and 82-62. The relevant authority, however, does not support Claimant's

assertion.  A Claimant's work experience is relevant to showing the type of work a claimant might be expected to do if it  (1) "was done within the last 15 years," (2) "lasted long enough for [the claimant] to learn to do it," and (3) "was substantial gainful activity [SGA]."  20 C.F.R. § 404.1565 (quoted in S.S.R. 80-62).  One of the policy statements cited by Claimant further clarifies that "work performed 15 years or more *prior to the time of adjudication of the claim* . . . is ordinarily not considered relevant."  S.S.R. 82-62 (emphasis added); *see also Rodriguez v. Barnhart*,, No. 03 Civ. 7272(RWS), 2004 WL 1970141, at *11 (S.D.N.Y. Aug. 23, 2004), *aff'd*, 163 Fed. Appx. 15 (2nd Cir. Dec 23, 2005) ("To be considered relevant work, a job generally must have been performed within the fifteen-year period ending on the date of the adjudication.").  This statement suggests that the relevant 15-year period runs backward from the date of adjudication, as opposed to the alleged disability onset date.  Accordingly, the ALJ was free to consider any work experience in the 15 years before the disability hearing when making her step-four finding.

With that question answered, it becomes apparent the ALJ committed no error in looking to Claimant's post-2005 work as past relevant work.  First, it occurred within 15 years before adjudication of the claim.  Second, the work was unskilled and therefore did not require much time to master.  *See* S.S.R. 82-62.  As the ALJ noted, Claimant's work did not require the more complex tasks that make some janitorial positions semi-skilled.  R. 23.  And third, substantial evidence existed that Claimant performed the work at an SGA level.  Work is "substantial" if it "involves doing significant physical or mental activities" and "gainful" if done "for pay or profit."  20 C.F.R. § 404.1572.  Work may constitute SGA even if done

on a part-time basis or if it entails less responsibility than a claimant had in a previous job. § 404.1572(a). If a claimant performs a job satisfactorily without the benefit of special accommodations, the work will often constitute SGA. § 404.1573. The relevant regulations also set forth yearly income levels at which a presumption arises that a claimant performed SGA. § 404.1574. Here, Claimant's income exceeded the presumed SGA level in 2007, R. 12–13, and Claimant's testimony does not rebut the presumption that his 2007 work constituted SGA. Claimant testified that he worked full-time as a fill-in janitor for up to six weeks at a stretch, and that he had no trouble doing his work at the full-time job. R. 50–52. Indeed, Claimant's briefs do not dispute the ALJ's finding that he worked at an SGA level in 2007, and Claimant's attorney told the ALJ that Claimant would be amenable to "a partial decision in some fashion starting in January of 2008." R. 97.

With the three elements of past relevant work satisfied, the ALJ was free to find Claimant not disabled if he retained the RFC to perform his past relevant job. S.S.R. 82-61. The ALJ did just that, so the Court concludes that substantial evidence supported the ALJ's step-four finding.

## IV. CONCLUSION

**The ALJ issued a thorough decision, and her decision is supported by substantial evidence. Claimant's treating physician opined that Claimant had the ability to work. No doctor opined to the contrary. For the reasons set forth in this opinion, the Court denies Claimant's motion for summary judgment or remand and affirms the Commissioner's decision.**

**SO ORDERED THIS 4th DAY OF JANUARY, 2011**.


_Morton Denlow_

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**


**Copies sent to:**

Frederick J. Daley, Jr.
Daley, DeBofsky & Bryant
55 W. Monroe St.
Suite 2440
Chicago, IL 60603

Counsel for Plaintiff

Rachel C. Steiner
Assistant Regional Counsel
200 W. Adams St.
Suite 3000
Chicago, IL 60606

Harpreet Kaur Chahal
United States Attorney's Office
219 S. Dearborn St.
Suite 500
Chicago, IL 60604

Counsel for Defendant